IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE TRUST OF BRESEL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE TRUST OF MORRIS BRESEL.

MARTI JO FRY, APPELLEE AND CROSS-APPELLEE,

V.

CANDEE MACK, APPELLANT, AND AMANDA MACK GUROCK, APPELLEE AND CROSS-APPELLANT.

Filed April 5, 2016.    No. A-14-922.

Appeal from the County Court for Douglas County: SHERYL L. LOHAUS, Judge. Affirmed as modified.

David J. Lanphier, of Broom, Clarkson, Lanphier & Yamamoto, for appellant.

Edward D. Hotz and Emily L. Jung, of Pansing, Hogan, Ernst & Bachman, L.L.P., for appellee Marti Jo Fry.

James Polack, P.C., L.L.O., for appellee Amanda Mack Gurock.

MOORE, Chief Judge, and INBODY and BISHOP, Judges.

MOORE, Judge.

## I. INTRODUCTION

Marti Jo Fry (Fry) brought this action in the county court for Douglas County, seeking an accounting and removal of Candee Mack (Mack) as cotrustee of a revocable trust. Fry also sought interpretation of a provision of the trust with respect to the occupancy of certain real property by Amanda Mack Gurock (Gurock). Mack filed a counterclaim, seeking an accounting and removal of Fry as cotrustee. Gurock filed a declaratory judgment action, under the same probate case number, seeking a determination of whether Fry's petition violated a provision of the trust. The

- 1 -

county court removed Mack as cotrustee and ordered her to account for all unauthorized distributions of trust property, to reimburse funds to the trust, and to pay attorney fees to Fry. The court also dismissed Mack's counterclaim and Gurock's claim against Fry. Mack appealed, and Gurock cross-appealed. We affirm the county court's order removing Mack as trustee, dismissing her counterclaim, and, except as modified herein, ordering her to reimburse funds to the trust. We also affirm the award of attorney fees to Fry from Mack. Finally, we dismiss Gurock's cross-appeal for lack of jurisdiction.

## II. BACKGROUND

### 1. BRESEL'S HISTORY

Morris Bresel (Bresel) and his wife, Jean Bresel (Jean), had one son, Jim Bresel (Jim), and two daughters, Mack and Fry. Gurock is Mack's daughter. Bresel established the Morris Bresel Revocable Trust (Trust) in 1985. It was amended and restated several times, most recently in 2006, 2008, and 2009. The terms of the Trust provide for Fry and Mack to serve as successor cotrustees in the event of Bresel's resignation, incapacity, or death.

After Jean died in 2001, Bresel began experiencing difficulty managing his daily affairs. In November 2006, Bresel signed a durable power of attorney appointing Mack to serve as his attorney in fact. However, she did not begin utilizing the power of attorney at that time. Mack testified that she had also been listed as a signatory for "years" on an Omaha State Bank account belonging to the Trust.

In 2007, Bresel's children became concerned with Bresel's ability to care for himself and manage his affairs independently. In particular, Mack and Jim describe entering their father's house in 2007 to find that their father had failed to keep up with cleaning in his home, allowed bills to go unpaid, and neglected his personal hygiene.

In August 2007, Mack and Fry took Bresel to Dr. Daniel Murman, a geriatric neurologist, for evaluation. Following this initial visit, Murman made a tentative diagnosis of non-Alzheimer's degenerative dementia. Murman referred Bresel for neuropsychological evaluation the following month, which yielded a diagnosis of frontotemporal dementia of mild severity. Murman testified that frontotemporal dementia is a degenerative disease that affects a person's judgment; decision-making; and control of their emotions, language, and executive cognitive function. The neuropsychologist who completed the evaluation encouraged Bresel to appoint a power of attorney for health care and finances.

In late January 2008, Bresel suffered a transient ischemic attack (TIA) and was admitted to the hospital. A TIA is similar to a temporary stroke; it is a temporary interruption in the blood supply that then resumes without permanent damage. Following the TIA, Bresel moved to an independent living apartment. By 2010, Bresel's mental state had declined considerably, and he moved into an assisted living apartment, followed by a move to a skilled care facility in September.

### 2. TRUST RESIDENCE

In August 2008, Gurock and her family moved into Bresel's home, which is the Trust Residence (Residence). Bresel, Gurock, and Gurock's husband signed a lease agreement shortly before the Gurocks moved to the Residence, providing that Gurock's family could reside in the Residence without paying rent for as long as they liked, so long as they paid certain house-related

expenses. Bresel agreed to take responsibility for major house repairs and house remodels. An April 2009 amendment to the Trust provides in its "DISPOSITION OF THE TRUST PROPERTY AFTER SETTLOR'S DEATH" that the

> Trustee shall allow and permit [Gurock] to occupy [the Residence] as principal place of residence for the benefit of her and her family; provided, however that while remaining on premises, without compensation to Trustee, [Gurock], shall be responsible for payment of real estate taxes, insurance premiums, and routine and orderly maintenance expenses during the period of her occupancy.

After moving into the Residence, the Gurocks sold their previous home. Because of a loss in the sale, the Gurocks used the Residence as collateral for a $20,000 loan. Mack signed various loan documents in her capacity as attorney-in-fact for the Trust. The record shows that the loan was paid off and the mortgage released in November 2011. Gurock's husband testified that the loan was paid through automatic withdrawals from the Gurocks' checking account.

### 3. TRUST FINANCIAL CONTROL

Although testimony conflicts as to precisely when, at some point in late 2007 or early 2008, Mack began overseeing her father's financial affairs, including writing checks from the Trust checking account. Mack continued writing checks for Bresel throughout 2008 and 2009. Although she held power of attorney and was a signatory on the Trust checking account, Mack ordinarily signed Bresel's name when she wrote checks from the Trust account. Over this time period, several large checks were written to Mack and Gurock from the Trust checking account. We have set forth the details of additional transactions involving trust property as necessary to the resolution of this appeal in the analysis section below.

Beginning in March 2009, Mack began paying herself a monthly fee for handling Bresel's financial affairs. According to Mack, she was to be paid $1,500 per month and checks written for larger amounts were "back paid from the year before" when Bresel moved into independent living and Mack "started taking care of him." Mack testified that this unwritten arrangement was based on conversation between herself, her father, and his attorney. Mack did not report this income on her tax returns or discuss the arrangement with Fry. Between March 2009 and December 2009, Mack paid herself fees totaling $31,000 from the Trust checking account.

### 4. FRY'S INVESTIGATION

In February 2010, Fry, who lives in Kansas, visited Bresel and drove him on various errands including a stop at the bank. While at the bank with Bresel, Fry learned that checks totaling approximately $13,000 had been written from the Trust checking account to Mack and Gurock in a 3-month period. Fry became concerned and began investigating whether Mack had been "taking advantage of [Bresel]." Bresel signed a power of attorney adding Fry as an attorney in fact in February. Utilizing the power of attorney, Fry began compiling lists of transactions from the Trust checking account that she deemed suspicious because they benefitted Mack or Mack's family.

In April 2010, Fry obtained a statement from Dr. Scott Prescher, Bresel's primary care doctor, which stated:

To whom it may concern:

[Bresel] has been diagnosed with Alzhiemers [sic], Dementia and Pick's disease. He is not able to make rational decisions anymore. Please be advised so his daughters, being Powers of Attorney, can make his financial and other decisions in his best interest.

During a subsequent meeting with Bresel's attorney and Mack, Fry saw a copy of the Trust agreement and first learned of the provisions with respect to the Residence. In November 2010, Fry sent an email to Bresel's care facility, stating that she was "co-trustee and co-POA" for her father and did not give permission to use his funds on anything other than his own personal use and care.

Fry's investigation of Mack's actions as cotrustee included requests for supporting documentation for certain reimbursements to Mack from the Trust checking account. Mack testified that she was unable to find the invoice relating to a $5,000 reimbursement to her when Fry asked for it, so she "tried to reenact it or recreate it," although she "found the correct one and submitted it" prior to her deposition. Mack agreed that she had prepared a bill for a little over $10,000 to justify the $5,000 reimbursement. Mack altered the amount charged on another bill "to re-create what I had spent," because she could not find an invoice for "some other stuff done at the house." Mack subsequently located the bill for this other work done at the Residence. Mack fabricated another invoice to justify reimbursement for work done at the Residence because she "didn't believe [she] needed to keep a copy of the [original] invoice." Mack subsequently found the original invoice for this work as well. She testified similarly with respect to yet another fabricated invoice but also agreed that the purpose of fabricating that invoice was "[p]robably" to mislead Fry. Mack testified that the original invoice for this work was "the only one we could not find," but stated that "[t]he work was done to the house."

## 5. SAFE DEPOSIT BOXES

At some point in her investigation, Fry inspected Bresel's safe deposit boxes. Fry testified that Bresel had four safe deposit boxes that she inspected with Mack in the spring of 2010. According to Fry, they wanted to inventory and consolidate the contents of the boxes. Fry and Mack found collectible coins, jewelry, and papers in Bresel's three safe deposit boxes at one bank, but they did not find any cash. They also viewed and "closed" a box at another bank that had "just papers" in it.

In the early 2000s, Fry had observed that Bresel had coins in one safe deposit box, jewelry in another, and paper in a third box. During another visit in the early 2000s, Fry visited other safe deposit boxes with Bresel and witnessed a box with papers, one with jewelry, and one with coins in it. Fry also observed that there were envelopes of cash in each of these three boxes. Fry did not count the cash or see inside of the envelopes, but she testified that Bresel had written "$10,000" on the outside of the envelopes. Fry observed six to eight envelopes on that visit. Fry only accessed the safe deposit boxes on these two occasions prior to 2010.

Fry testified that at some point prior to 2010, which she specified as being "somewhere in the early 2000s," Bresel drove to Kansas City and gave Fry $120,000 in cash in the form of envelopes containing $10,000 each and instructed her to keep them in a safe deposit box. After six months or a year, Fry returned the money to Bresel and the two visited his bank and deposited it

into one of his safe deposit boxes. The only other thing Fry observed in that box was papers. Fry did not view that box again until 2010. Fry did not know where Bresel got the $120,000 he had her hold for him or whether he used the cash for gambling trips or trips with female companions. When asked if there was any explanation for why her father would keep $120,000 in cash in safe deposit boxes, as opposed to investing it, Fry testified that it "was a nest egg" and that Bresel discussed with her the fact that he "always wanted to know that he would have money if he needed it."

According to Jim, when he worked with his father from the 1970s to the 1990s, he "had a lot of cash." Jim testified that Bresel told him that he took cash with him when he went on trips to Las Vegas during this period and that he kept his cash in safe deposit boxes. Jim testified that his father told him in approximately 2005 that he had 50 envelopes of $10,000 each in his safe deposit boxes. Jim has never viewed any of Bresel's safe deposit boxes, and he did not know where the boxes referenced in the 2005 conversation were located.

During her deposition taken in 2013, Mack admitted that Bresel may have had some cash in his safe deposit boxes, but she denied ever removing cash from Bresel's boxes. At trial, Mack again testified that she never removed any cash from Bresel's safe deposit boxes and that the only cash she observed was cash belonging to her and her husband in a box they shared with Bresel. She testified that at one time there was approximately $30,000 or $35,000 in this shared box that she and her husband won in a tournament in Las Vegas. She later testified that there was $50,000 in their box at one point. Mack's husband confirmed that they kept gambling winnings in their safe deposit box. Mack testified that there was no cash in the box she and her husband currently had at the time of trial. Mack testified that there was no cash in Bresel's box during a 2008 visit. Mack and her husband both testified at trial about the source of cash deposits reflected in their bank accounts, indicating that if they needed extra money for something, they would remove some of their gambling winnings from their safe deposit box and deposit into their accounts.

Further details about the safe deposit boxes will be included in the analysis section below.

### 6. BRESEL'S MENTAL CAPACITY IN 2007-2010

At trial, conflicting evidence was presented as to Bresel's mental capacity in the period between his first visit with Murman in 2007 and the written statement of incapacity by Prescher in 2010. Murman saw Bresel a number of times between 2007 and 2010, and he testified that Bresel "clearly declined each of the three years that I saw him" and "lost his ability to make sound judgments during that time." Murman stated that his relationship with Bresel was clinical and that although he made determinations regarding Bresel's functional capabilities in the treatment context, he was not able to form an expert opinion as to when Bresel would have lost legal capacity. Both Fry and Jim testified that as early as 2007, Bresel would become disoriented and not know where he was when they were driving together in Omaha. Jim testified that all three children felt that Bresel was no longer able to live alone safely at this time. Jim believed that Bresel's memory had significantly slipped by 2007. Murman's office notes from a visit in August 2007 indicate Bresel's daughters reported that Bresel did not change his clothes, exhibited hoarding behavior, repeated questions frequently, and forgot names and people he had been friends with for years. Fry also noticed personality changes at this time.

However, witnesses also testified that even in 2008, Bresel enjoyed an active social life including dancing, girlfriends, and visiting the casino. Several witnesses testified to eating lunch and having meaningful conversation with Bresel over this 3-year period. Mack testified that her father was depressed, but that she would have rated his mental faculties at 95-percent until April 2010.

### 7. PROCEDURAL HISTORY

In November 2010, Fry filed this action under the Nebraska Uniform Trust Code (Trust Code), requesting that the county court remove Mack as cotrustee and require her to account and reimburse the Trust for certain transactions made between 2007 and 2010. Fry also sought attorney fees. She set forth a second cause of action, requesting an interpretation of a provision in the Trust with respect to Gurock's occupancy of the Residence and an order limiting the period of Gurock's occupancy. Mack answered and filed a counterclaim, in which she sought removal of Fry as cotrustee, an accounting, damages, and attorney fees. Gurock filed a petition for declaratory judgment, requesting that the court determine whether Fry's petition violated the "no contest" clause of the Trust, and if so, to enter an order limiting Fry's share of the Trust, removing her as cotrustee, quashing her outstanding discovery, and awarding Gurock attorney fees. Trial was held on multiple dates between September 2013 and June 2014. At trial, the parties stipulated to the reasonableness of each respective affidavit of attorney fees and costs, and that the same were reasonable.

On August 5, 2014, the county court entered an order ruling on the parties' claims. Bresel was alive at the time the order was issued, but has since died. The court found that from at least mid-2007 onward, Bresel was incapable of handling his daily personal and financial affairs which made him easily exploitable and that his condition continued to deteriorate. The court found that Fry provided clear and convincing evidence that from the time Mack took control of Bresel's bill paying and financial matters, Mack used her fiduciary position for her and her family's benefit. The court further found that Mack was acting as Bresel's successor cotrustee from 2007 through 2010 as evidenced by her numerous and frequent transactions on behalf of Bresel.

The county court found that Mack had improperly withdrawn Trust property for the benefit of herself and her family and had created false invoices to justify the transactions. The court ordered her to repay the Trust $126,199.22 for these expenditures. The court also ordered Mack to repay $31,000 that she had paid herself for taking care of her Bresel while he resided in a care facility and to repay $120,000 in cash from Bresel's safe deposit boxes. The court determined that Fry presented clear and convincing evidence that Mack engaged in serious breaches of trust and multiple self-dealing transactions and should be removed as successor cotrustee. The court further found that Mack failed to present to the court clear and convincing evidence that her transactions were expressly authorized and in the best interests of the trust. The court removed Mack as cotrustee and ordered her to account to the Trust for all unauthorized distributions of Trust property to herself and for the benefit of her family. Additionally, the court dismissed Mack's counterclaim and request for attorney fees, and it ordered her to pay Fry's attorney fees of $258,805.92.

With respect to Gurock's occupancy of the Residence, the county court determined that pursuant to the agreement reached between Bresel and Gurock in August 2008, and Gurock's understanding of the agreement, the Gurocks were permitted to reside in the Residence rent-free

until Bresel's death. The court held that because the Trust, by its terms, terminated upon Bresel's death, Gurock's right to occupy the Trust real property should also terminate upon his death. The court further found that Fry's action for interpretation of the Trust was not a contest of the Trust itself. Because Gurock's claim against Fry was not support by sufficient evidence, the court dismissed it and denied Gurock's request for fees.

Mack filed a motion for new trial or in the alternative to alter or amend judgment, which the county court denied on September 16, 2014. Mack subsequently perfected her appeal to this court, and Gurock cross-appealed. We note the parties filed a joint stipulation of facts with this court, indicating that on July 20, 2015, during the pendency of this appeal, Gurock moved out of the Trust Residence and relocated with her family to New York.

## III. ASSIGNMENTS OF ERROR

Mack asserts, restated and reordered, that the county court erred in (1) determining that Bresel was incompetent and subject to undue influence beginning in 2007 and that Mack was acting as successor cotrustee from that time, (2) considering and admitting medical testimony regarding the mental capacity of Bresel, (3) finding Mack liable for and assessing damages against her of $31,000 for payments earmarked for caring for her father, (4) determining the liability of Mack and assessing damages against her for $126,199.22 for transactions, (5) admitting into evidence summaries of "suspicious transactions," (6) assessing damages against Mack for $120,000 for allegedly removing cash from safe deposit boxes and error in admitting into evidence summaries and a correlation analysis, (7) removing Mack as cotrustee and admitting her conviction for criminal mischief, (8) dismissing Mack's counterclaim for removal of Fry, and (9) finding Mack liable and assessing damages against her for $258,805.92 for Fry's attorney fees and in denying Mack's claim for attorney fees.

In her cross-appeal, Gurock asserts that the county court erred in (1) determining that the Trust terminates upon Bresel's death, (2) determining that Gurock's use of the Trust Residence terminates upon Bresel's death, (3) reforming the Trust, (4) interpreting the Trust, (5) determining that Fry did not violate the Trust's "no contest clause," and (6) denying Gurock's request for attorney fees.

## IV. STANDARD OF REVIEW

In trust administration and probate cases, an appellate court uses an "issue-specific approach" to determine the appropriate standard of review. *In re Estate of Robb*, 21 Neb. App. 429, 839 N.W.2d 368 (2013). Absent an equity question, an appellate court reviews trust administration matters for error appearing on the record. *In re Rolf H. Brennemann Testamentary Trust*, 288 Neb. 389, 849 N.W.2d 458 (2014). But when an equity question is presented, appellate review of that issue is de novo on the record. *Id.* The removal of a trustee is a question of equity. *In re Estate of Robb*, *supra*. Accordingly, in a trust proceeding, an appellate court reviews de novo the question of whether a trustee was properly removed. *Id.*

An action for accounting may be one in law or one in equity. *Floral Lawns Mem'l Gardens Ass'n v. Becker*, 284 Neb. 532, 822 N.W.2d 692 (2012). An accounting action at law is based upon a contract, express or implied. *Lone Cedar Ranches, Inc. v. Jandebeur*, 246 Neb. 769, 523 N.W.2d 364 (1994). For an action for a legal accounting to lie, it must appear that the defendant has

received property or money not belonging to him or her, which he or she is bound to account for to the plaintiff, and that the plaintiff is the owner of such property or money. *Id.* Generally, in order to be entitled to the equitable remedy of accounting, it is necessary to allege a fiduciary, trust, or confidential relationship; a complicated series of accounts; or the inadequacy of a remedy at law, the latter being the basic reason for asserting equitable jurisdiction. *Id.* The allegations of a petition establish the essential character of a cause of action and the remedy or relief it seeks and thus determine whether a particular action is one at law or in equity, unaffected by the conclusions of the pleader or what the pleader calls it. *Id.* Having reviewed the pleadings, we conclude that both Fry and Mack have sought the equitable remedy of accounting and have treated the accounting claims as such in the analysis section below.

When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Estate of Panec*, 291 Neb. 46, 864 N.W.2d 219 (2015). When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Id.*

## V. ANALYSIS

An appellate court is obliged to dispose of a case on the basis of the theory presented by the pleadings on which the case was tried. *Linda N. ex rel. Rebecca N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014). This case was brought under the Trust Code for removal of a trustee and for an accounting. Neb. Rev. Stat. § 30-3890 (Reissue 2008) empowers a court to require a trustee who has committed a breach of trust to account for trust property or to redress a breach by paying money. The Trust Code does not provide a theory of recovery against non-trustees. See *id.* Accordingly, the threshold issue is whether Mack was acting as a cotrustee in the 2007-2010 period when she allegedly mismanaged Trust property, which in turn depends upon whether Bresel had the requisite capacity to act as trustee during that time frame. We therefore consider this issue first.

### 1. BRESEL'S CAPACITY TO SERVE AS TRUSTEE

Mack asserts that the county court erred in finding that Bresel was incompetent beginning in 2007 and that she was a successor cotrustee from that time. The terms of the Trust provide, "In the event of resignation, incapacity, or death of [Bresel], then [Bresel's] daughters, [Fry and Mack], shall serve as Successor Co-Trustees." After considering the language of the trust instrument and the evidence on the record, we determine that the county court was not clearly wrong in finding that Bresel lacked capacity to serve as trustee under the terms of the Trust beginning in 2007.

We first consider what level of "capacity" the terms of the Trust require of a trustee. "Capacity" is not a static characteristic that a person either possesses or lacks; a person may simultaneously possess the capacity to perform one task while lacking the capacity for another. See, e.g., *In re Estate of Wagner*, 246 Neb. 625, 522 N.W.2d 159 (1994) (possessing testamentary capacity but not mental capacity to manage daily affairs). Other types of capacity, such as the capacity to stand trial, also involve issue-specific tests. See *State v. Hessler*, 282 Neb. 935, 807 N.W.2d 504 (2011); see, also, ABA Commn. on L. & Aging & Am. Psychological Assn., *Assessment of Older Adults with Diminished Capacity: A Handbook for Lawyers* (2005).

Neither the Trust Code nor the Trust instrument defines "incapacity" or provides instructions on how to determine whether the settlor has become incapacitated to the extent that the need for a successor trustee exists. The Trust Code states that the capacity required to "to create, amend, revoke, or add property to a revocable trust, or to direct the actions of the trustee of a revocable trust, is the same as that required to make a will." Neb. Rev. Stat. § 30-3853 (Reissue 2008). The statute is notably silent, however, on the capacity required to *serve as a trustee* of a revocable trust. Because capacity to serve as a trustee must reflect a trustee's mental abilities to carry out the trustee's duties as required by the Trust, we turn to the trust document itself to determine those duties.

Under the terms of the Trust, the trustee's duties encompass significant financial management including investing, transferring, selling, exchanging, partitioning, leasing, and mortgaging trust property; voting on corporate shares; borrowing money; and registering securities. Therefore, we hold that for purposes of this Trust, the trustee lacks capacity when he no longer has the mental abilities to perform the financial management that the Trust requires.

We next consider the question of whether Bresel lacked the capacity necessary to carry out the financial duties that the Trust required. Where evidence relating to mental capacity is conflicting, the issues of fact are questions for the trier of fact. See *In re Wahl's Estate*, 151 Neb. 812, 825, 39 N.W.2d 783, 790 (1949) (mental capacity to make a will). Accordingly, our review is limited to considering whether the county court's determination that Bresel lacked this capacity as early as 2007 is supported by facts in evidence.

Bresel's children testified that he was failing, uncharacteristically, to pay his bills by 2007. They also noticed Bresel's increasing disorganization and, at times, disorientation. Specialists noted that Bresel had difficulty with organization, planning, and memory, and could use assistance with financial management. This evidence supports the county court's determination that Bresel did not have the capacity to serve as trustee from mid-2007.

### 2. MACK'S ACCEPTANCE OF TRUSTEESHIP

Having determined that Bresel lost capacity to serve as trustee as early as 2007, we next consider whether Mack accepted trusteeship as early as 2007. The Trust Code establishes the legal standard for accepting trusteeship when the terms of the trust do not state a method of acceptance. Under Neb. Rev. Stat. § 30-3857(a)(2) (Reissue 2008), a trustee may accept trusteeship "by accepting delivery of the trust property, exercising powers or performing duties as trustee, or otherwise indicating acceptance of the trusteeship." A trustee may also accept trusteeship "by registering the trust in accordance with established statutory procedures." § 30-3857(a)(3).

The county court held that Mack accepted trusteeship and began acting as trustee in 2007 "as evidenced by the numerous and frequent transactions on behalf of [Bresel] from 2007 through 2010." Whether Mack's transactions involved "exercising powers or performing duties as trustee" is a question of fact, which we review for error appearing on the record. See *In re Rolf H. Brennemann Testamentary Trust*, 288 Neb. 389, 849 N.W.2d 458 (2014). We therefore will not reweigh the evidence on this question but look only to whether the county court's determination is supported by competent evidence. See *In re Trust Created by Nabity*, 289 Neb. 164, 854 N.W.2d 551 (2014) (appellate court, in reviewing judgment for errors appearing on record, will not

substitute its factual findings for those of trial court when competent evidence supports those findings).

While the evidence would support varied conclusions on this question, we determine there is sufficient evidence to support the county court's determination. Jim testified that Mack agreed to "take over" Bresel's finances as early as 2007 after doctors suggested Bresel utilize a power of attorney for finances. Mack admitted that she signed checks for her father from the Trust checking account beginning in 2008. Mack also admitted that she was aware that she and her sister would become successor cotrustees when her father was no longer his own trustee. Given the county court's finding of Bresel's incapacity, Mack's knowledge of her position as prospective successor cotrustee, and her management of Trust property, a trier of fact could conclude that Mack began acting as successor cotrustee beginning in 2007. Therefore, the county court was not clearly wrong to determine that Mack served as cotrustee beginning in 2007.

### 3. Admission of Medical Testimony

Mack next asserts that the county court erred in considering and admitting medical testimony regarding Bresel's mental capacity. At trial, Mack's attorney made a relevancy objection to the offer of the clinical summary of Bresel's first clinical evaluation by Murman, which the county court received over her objection. The relevancy objection was based on Murman having stated in his deposition that he did not have the medical certainty to opine as to when, prior to 2010, Bresel lost the capacity to make rational decisions. The court also overruled Mack's relevancy objections to Murman's testimony regarding Bresel's diagnosis of frontotemporal dementia and the admission of additional medical records with respect to the clinical evaluations of Bresel between 2007 and 2010.

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Arens v. NEBCO, Inc.*, 291 Neb. 834, 870 N.W.2d 1 (2015). For evidence to be relevant, all that must be established is a rational, probative connection, however slight, between the offered evidence and a fact of consequence. *Id.* A medical opinion that is not based on a reasonable degree of medical certainty or probability may be irrelevant. See *Richardson v. Children's Hosp.*, 280 Neb. 396, 787 N.W.2d 235 (2010) (objection to opinion of expert based upon lack of certainty in opinion is objection based upon relevance). However, Murman did not testify to an opinion as to Bresel's mental capacity or incapacity at any time prior to 2010. Instead, he testified to his diagnosis of Bresel, and his observations of Bresel's functional capacity while Bresel was under his care. His testimony and office records also provide a timeline of Mack and Fry's concerns about and observations of their father's changing behavior. Murman did not testify as to the date of Bresel's incompetence, which is the only opinion on which he admitted he lacked a reasonable degree of medical certainty. Because Murman's testimony and office notes offer relevant information that may be helpful to the trier of fact, the county court did not abuse its discretion in receiving this evidence.

### 4. Finding of Breach of Fiduciary Duty by Mack

Mack challenges the court's finding that she was liable for various expenditures made while she was acting as cotrustee. Before we analyze each item of damage, we set forth the basic

propositions of law relative to breaches of fiduciary duty. Like a power of attorney, a trust creates a fiduciary relationship regarding property. *In re Estate of Hedke*, 278 Neb. 727, 773 N.W.2d 13 (2009)(action to set aside trust and recover assets defendant wrongfully took while acting as trustee). Except in discrete circumstances, the trustee is strictly prohibited from engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests. *Id*. A trustee's actions are presumed proper and the burden rests on a plaintiff to prove a breach of trust. *In re Rolf H. Brennemann Testamentary Trust*, 288 Neb. 389, 849 N.W.2d 458 (2014). Unless an exception under § 30-3867 applies, a beneficiary establishes a prima facie case of fraud by showing that a trustee's transactions benefited the trustee at the beneficiary's expense; the burden of going forward with evidence then shifts to the trustee to establish by clear and convincing evidence that the transaction was made under a power expressly granted in the trust and the clear intent of the settlor, and the transaction was in the beneficiary's best interests. *In re Estate of Hedke, supra*.

As is clear from the court's order, it properly placed the burden of establishing a breach of duty by Mack upon Fry. The court found that Fry presented clear and convincing evidence that Mack engaged in serious breaches of trust and multiple self-dealing transactions and should be removed as successor cotrustee. The court then properly shifted the burden of going forward to Mack. The court found that Mack failed to present to the court clear and convincing evidence that her transactions were expressly authorized and in the best interests of the trust. We now turn to each item of liability challenged by Mack.

(a) Mack's Liability for $31,000 of Checks to Self

Mack asserts that the county court erred in determining she was liable for $31,000 for payments she made to herself for caring for her father.

Under the Trust Code, a court has the power to order a trustee to account and repay money for a breach of trust. § 30-3890. Although the Trust Code allows for reasonable compensation to a trustee, Neb. Rev. Stat. § 30-3864 (Reissue 2008), unauthorized self-dealing is a breach of the trustee's fiduciary duty to act solely in the interest of the Trust.

A trustee's duty is to administer the trust solely in the interest of the beneficiaries. Neb. Rev. Stat. § 30-3867(a) (Reissue 2008). However, when a trust is revocable, the rights of the beneficiaries are subject to the control of, and the duties of the trustee are owed exclusively to, the settlor. Neb. Rev. Stat. § 30-3855(a) (Cum. Supp. 2014). Here, Bresel is the settlor of a revocable trust and held the beneficial interest in the Trust during his lifetime. At the time of trial, Bresel was alive. Accordingly, the trustee owed her duties exclusively to Bresel, as he was both the settlor and the holder of the Trust's beneficial interest at all relevant times. Bresel's daughters and grandchildren, to whom the trustee was to distribute Trust assets after Bresel's death, are best understood as contingent beneficiaries during Bresel's lifetime and the trustee owed no duty to them. See *Manon v. Orr*, 289 Neb. 484, 856 N.W.2d 106 (2014) (contingent beneficiaries of revocable trust lacked standing to seek constructive trust over trust assets that settlor sold, regardless of settlor's alleged mental incapacity at time of sale).

A trustee's determination of his own compensation level may place his interests directly at odds with the holder of a beneficial interest in a trust and constitute a serious breach of trust. See *In re Estate of Robb*, 21 Neb. App. 429, 839 N.W.2d 368 (2013). This is because a higher rate of

- 11 -

compensation financially benefits the trustee while a lower rate of compensation financially benefits the trust from which the compensation is drawn. Therefore, the determination of a fee for Mack put Mack's interests at odds with Bresel's.

An issue of fact exists on the record as to whether the $31,000 of checks that Mack wrote herself from the Trust account were properly authorized compensation for her service as a trustee, or whether they were unauthorized self-dealing in breach of her fiduciary duties to Bresel. Because this is an issue of fact, our review is limited to a consideration of whether the county court's decision was in clear error. See *In re Rolf H. Brennemann Testamentary Trust*, 288 Neb. 389, 849 N.W.2d 458 (2014). Mack argues that both Bresel and his attorney approved the $1,500 per month payments. Although Bresel's attorney testified that he and Bresel discussed a reasonable fee with Mack, he did not recall setting that fee at $1,500 per month.

The circumstances of Mack's payments to herself undermine her assertions that the compensation was approved. Mack wrote and signed many of the checks herself. Mack at times paid herself $2,400 or $3,600 per month rather than $1,500. Between March and December 2009, she paid herself $31,000, which she claims was reimbursement for retroactive fees. She testified that she could have paid herself retroactively to 2001 because that is when she started caring for Bresel, but that she chose only to pay herself retroactively to 2008. Mack's flexible opinion on how long she could have justified paying herself retroactively suggests that she did not have clearly authorized guidance from an outside party. Additionally, there is no evidence aside from Mack's word that anyone but Mack determined the amount of her monthly fee. Determining her own monthly fee sets Mack's interests in direct opposition to those of the Trust. See *In re Estate of Robb*, *supra*. We do not read the trial court's decision noting the lack of a written agreement to invoke the statute of frauds; rather, the trial court was correctly pointing out the lack of evidence that these payments were authorized.

Given the lack of evidence that Mack's payments to herself were approved, the retroactive nature of her payments, and the wide variation in the amounts she paid herself each month, the county court was not clearly wrong in concluding that these payments constituted a breach of trust and require repayment.

(b) Liability for Other Trust Property Transactions

Mack next asserts that the county court erred in assessing damages against her for $126,199.22 for various transactions. Mack argues that she was acting as an account signatory and not a trustee when she wrote checks from the Trust checking account, that she utilized her power of attorney when pledging Trust property for the Gurocks' loan, and that the loan was paid off.

Regarding Mack's first argument, we disagree with the assertion that Mack was not a trustee at the time of the checking account transactions, as detailed above.

Further, although the county court noted the $20,000 loan in the section of its August 2014 order discussing the award of $126,199.22, the evidence supports the court's award of that amount without reference to the loan. Accordingly, we find that Mack's arguments regarding the loan are immaterial.

The record presents evidence of a total of $115,289.01 in contested transactions from the Trust checking account. However, these checking account transactions include the $31,000 in checks Mack wrote to herself for caring for her father. When this $31,000 is subtracted, as it is

dealt with separately, the record supports a finding of $84,289.01 in contested checking account transactions. The record further demonstrates that Mack withdrew cash or transferred to her own account $39,022.41 of funds from Bresel's certificates of deposit (CDs). Additionally, Mack deposited an insurance check written to Bresel in the amount of $2,887.80 into her own account. The evidence from the checking account, CDs, and insurance check represent exactly $126,199.22 in transactions without inclusion of the $20,000 loan. Accordingly, even if we accept Mack's assertion that she executed the loan utilizing her power of attorney or that the loan was repaid, this is immaterial to the county court's award. Accordingly, this assignment of error is without merit.

### 5. SUMMARY EVIDENCE OF "SUSPICIOUS TRANSACTIONS"

Mack asserts that the county court erred in admitting exhibits 223 through 226 because they are improper summaries that were not admissible under Neb. Rev. Stat. § 27-1006 (Reissue 2008) (governing admission of summaries of voluminous evidence) and because they were created with unclean hands. These exhibits are comprised of copies of checks drawn on the Trust checking account and include summary pages identifying and totaling the amounts of those checks deemed "suspicious" by Fry. Fry obtained copies of the checks with her power of attorney and compiled the summary pages during the course of her investigation of Mack's actions as cotrustee.

As an initial matter, we address Mack's assertion that the court should not consider this evidence because Fry obtained it with unclean hands. Under the doctrine of unclean hands, a person who comes into a court of equity to obtain relief cannot do so if he or she has acted inequitably, unfairly, or dishonestly as to the controversy in issue. *Farmington Woods Homeowners Ass'n v. Wolf*, 284 Neb. 280, 817 N.W.2d 758 (2012). Generally, conduct which forms a basis for a finding of unclean hands must be willful in nature and be considered fraudulent, illegal, or unconscionable. *Id.* We decline to find that Fry acted with unclean hands in this case. Fry's investigation into the transactions concerning the Trust was not fraudulent, illegal, or unconscionable.

Turning to the improper summary argument, assuming without deciding that the initial summary pages of exhibits 223 through 226 were not admissible under § 27-1006, we find that their admission was at most harmless error because the information contained in the summaries are cumulative of the actual checks and Fry's testimony about her investigation. Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *Worth v. Kolbeck*, 273 Neb. 163, 728 N.W.2d 282 (2007*).* The checks themselves were admitted and support the court's determinations without reference to the summaries.

### 6. SAFE DEPOSIT BOXES

Mack next asserts that the county court erred in ordering her to pay $120,000 to reimburse cash withdrawals from safe deposit boxes owned by Bresel. With respect to the safe deposit boxes, the county court specifically found:

> [Bresel] frequently kept large sums of cash in four safety deposit boxes that he rented and [to which he] granted Mack access. At one time [Bresel] had at least 50 envelopes containing $500,000.00 Competent supporting evidence exists that Mack made large amounts of cash deposits into her bank accounts at or shortly after visits to [Bresel's] safety

deposit boxes. During that time, [Bresel] and Mack were the constant individuals who accessed the boxes. By 2010 the safety deposit boxes contained no cash. The evidence presented by Fry supports a finding that Mack should reimburse the Trust $120,000.00.

Although the county court found that "at one time," Bresel's safe deposit boxes contained $500,000 in cash, the question that we must first consider is whether competent evidence exists to support a finding that $120,000 was contained in the boxes during the period between 2007 when Mack began serving as cotrustee and 2010 when Mack and Fry visited the boxes together and found no cash.

Jim testified that his father told him that he had 50 envelopes of $10,000 each in his safe deposit boxes in approximately 2005, but Jim never viewed the safe deposit boxes. Fry testified that in the early 2000s, Bresel gave her $120,000 in cash in the form of envelopes containing $10,000 each, which cash she returned to Bresel approximately six months to a year later. At that time, she and Bresel deposited the cash into one of his safe deposit boxes. On another visit in the early 2000s, Fry visited other safe deposit boxes with Bresel and witnessed that there were envelopes of cash in each box. She saw six to eight envelopes on that visit. Mack gave varying accounts as to whether any cash existed in Bresel's safe deposit boxes prior to 2010. The evidence shows that Bresel continued to gamble at the casinos on a regular basis and use cash for social activities after 2007.

The evidence is clear that Bresel's safe deposit boxes did not contain any cash in 2010. The evidence also supports a conclusion that there were large amounts of cash, anywhere from $120,000 to $500,000, in the boxes in the early to mid-2000s. However, the evidence does not show how much, if any, cash existed in Bresel's safe deposit boxes in the relevant period from 2007 to 2010.

Next, we consider the evidence of visits to the various safe deposit boxes and the cash deposits to Mack's bank accounts to see whether the evidence supports a conclusion that Mack removed some amount of cash from Bresel's safe deposit boxes between 2007 and 2010 and deposited into her own accounts. The county court, in essence, adopted the correlation argument advanced by Fry in comparing Mack's visits to Bresel's safe deposit boxes with certain deposits into her own bank accounts.

The record includes safe deposit box entrance records for five separate boxes. For purposes of this analysis, we have referred to the four boxes shown in exhibits 200-203 as Bresel's boxes and the box shown exhibit 204 as the Macks' box. We have only summarized the safe deposit box visits reflected on these records between 2007 and 2010.

The first safe deposit box, shown in exhibit 200, was rented by Bresel and Mack. The record shows that Bresel signed the rental agreement, but it does not reveal whether Mack was an original co-renter or was given access later. Fry was added to the list of those with access to the box in 2010. This safe deposit box was then closed and reopened as a two signature box with access by Mack and Fry. According to the signatures on the entrance records, no one accessed this safe deposit box in 2007; it was accessed only by Bresel in 2008; no one accessed the box in 2009; and it was only accessed by Fry or Fry and Mack together in 2010.

Exhibit 201 only includes safe deposit box entrance records and does not include the lease agreement for this second box. The people authorized to access the second box were Bresel, Jean,

Mack, and Fry. Exhibit 201 does not show who was given access to the box at what point, although Mack testified that Fry was added in 2010. According to the signatures on the entrance records, the second box was only accessed by Bresel in 2007 and 2008, although for two of the visits in 2008, the initials "CM" appear after Bresel's signature. The testimony of the bank employee who reviewed these records at trial was somewhat unclear, but she stated that the initials after the signature probably meant that a second person also accessed the box. Mack's testimony about the initials is also unclear. Her testimony does not reflect whether she initialed because she also accessed the box on those occasions or she initialed because she signed Bresel's name. No one accessed the second box in 2009, and only Mack and Fry together accessed it in 2010.

The third safe deposit box, shown in exhibit 202, was rented by Bresel, Jean, and Fry. Mack was given access at some point. Mack and Fry closed the third box in 2010. According to the signatures on the entrance records, only Bresel accessed the third box in 2007 and 2008; no one accessed the box in 2009; and only Mack together with Fry accessed it in 2010.

The fourth safe deposit box, shown in exhibit 203, was rented by Mack, Bresel and Gurock. Mack described this as a safe deposit box rented by her for Gurock, but she stated that Bresel kept extra papers and coins in it. According to Mack, Fry was given access in 2010. The fourth box was closed by Mack and Fry in 2010. According to the signatures on the entrance records, in 2007 and 2008, the fourth box was only accessed by Bresel; no one accessed the box in 2009; and only Mack and Fry together accessed it in 2010. With respect to the signatures shown on exhibit 203 for 2008, Mack testified that at least some of "Bresel" signatures for 2008 were instances of her signing Bresel's name. There is nothing in the testimony to indicate who actually entered the box vault on those occasions.

The fifth safe deposit box, shown in exhibit 204, was rented by Mack, Mack's husband, and Gurock. Bresel was added at some point although he never accessed the fifth box. The fifth box was closed in 2010. Exhibit 204 shows that the fifth box was accessed on various occasions by the Macks and Gurock between 2007 and 2010, although no on accessed the fifth box in 2009.

As to the cash deposits into Mack's bank accounts, the evidence shows that Mack made cash deposits of $75,860 in 2008, $27,160 in 2009, and $7,120 in 2010 for a total of $110,140. The record does not reflect the amount of any cash deposits made by Mack into her accounts in 2007.

There is circumstantial evidence in the record to support a conclusion that in 2007 and 2008, Mack made several visits to Bresel's safe deposit boxes with her mentally incapacitated father and then made large deposits of cash into her bank accounts. However, the circumstantial evidence also supports a conclusion that Mack made several visits to her own safe deposit box between 2007 and 2010 and then made large deposits of cash into her bank accounts. In other words, when the safe deposit box entrance dates for all five boxes are compared to the cash deposit dates, a correlation could just as easily be made between the visits to the Bresel boxes and the cash deposits into Mack's accounts as it could between the visits to the Macks' box and the cash deposits into Mack's accounts. There is only one occasion when a Bresel box visit and a cash deposit occurred on the same day. Only one-third of the Mack box visit dates in 2008 coincided with visits to the Bresel boxes. A few of the cash deposits are on the day after a safe deposit box visit (to either a Bresel box or the Mack box), but most of the cash deposits range from several days to weeks or even months after a safe deposit box visit. The $110,140 cash deposit total

between 2008 and 2010, includes $27,160 in cash deposits for 2009, when no one visited any of the boxes. It also includes cash deposits in 2010 totaling $7,120 when any visits to Bresel's boxes were made by Fry or Fry and Mack together and when the Macks visited their own box.

Upon our review, we conclude that the county court erred in its determination that Mack removed $120,000 in cash from Bresel's safe deposit boxes.

### 7. SUMMARY EVIDENCE REGARDING SAFE DEPOSIT BOXES

Mack next asserts that exhibits 206 and 207, the summary evidence of her visits to the safe deposit boxes, should not have been admitted. Exhibits 206 and 207 contain initial summary pages identifying the dates of safe deposit box visits and subsequent cash deposits into the checking accounts belonging to Mack and her husband and the totals of those deposits. Supporting documentation in the form of copies of statements from the Macks' bank accounts comprise the remaining pages of exhibits 206 and 207. Other supporting documentation, copies of rental contracts, and entrance records for the safe deposit boxes, were admitted into evidence via other exhibits not addressed by Mack in her arguments in connection with this assignment of error.

In ruling on the admission of exhibits 206 and 207, the county court stated, "I won't look at the summary. I'll just look at the records." In its August 2014 order, the court noted that "page 1" of exhibit 206 and "page 1" of exhibit 207 were not received into evidence. Although the summary portion of exhibit 206 is actually two pages in length and the summary portion of exhibit 207 is four pages, we conclude that the court did not receive the summary pages into evidence or consider the summaries in its deliberations. Mack's arguments do not address the admission of the remaining pages of exhibits 206 and 206. This assignment of error is without merit.

### 8. REMOVAL AS COTRUSTEE

Mack next asserts that the county court erred in removing her as cotrustee. Removal of a trustee is a question of equity that we review de novo on the record. See *In re Estate of Robb*, 21 Neb. App. 429, 839 N.W.2d 368 (2013). The Trust Code provides in relevant part, that a court may remove a trustee if "the trustee has committed a serious breach of trust" or "lack of cooperation among cotrustees substantially impairs the administration of the trust." Neb. Rev. Stat. § 30-3862(b) (Reissue 2008).

We agree with the county court's removal of Mack as a trustee under these standards. In addition to the contested transactions detailed above, Mack admitted in a 2011 deposition that she had wrongfully written herself a $20,000 check from Bresel's Trust account and deposited it into her own checking account. Although she offered to repay the money at her deposition, she had not repaid that money to the Trust by the time she testified at trial in 2014. There is no dispute that Mack was serving as Trustee during this period between her deposition and her trial testimony in which she allegedly first discovered her wrongful $20,000 appropriation of Trust property and then failed to repay it. Wrongfully holding Trust property because she was "waiting to be told to pay it back" is an action that advances Mack's interests at the expense of the Trust's interests and constitutes self-dealing and a serious breach of trust. See *In re Estate of Robb*, *supra*.

Additionally, evidence in the record reflects not only that lack of cooperation among cotrustees substantially impairs the administration of the trust, but that Mack fostered much of that lack of cooperation by fabricating and altering invoices when her sister asked for her to account

for her uses of Trust property. We therefore agree that removal of Mack as cotrustee was within the county court's authority and is proper under § 30-3862.

Mack also argues that the county court erred in admitting evidence of her criminal mischief conviction. Upon a de novo review in an appellate court, incompetent, irrelevant, and immaterial evidence offered in the original trial, which was admitted over proper objections by the adverse party, will be disregarded. *Sellers v. Sellers*, 23 Neb. App. 219, 869 N.W.2d 703 (2015). Assuming without deciding that Mack's criminal mischief conviction was inadmissible, we have disregarded it in our de novo review of the record. This assigned error is therefore without merit.

## 9. DISMISSAL OF COUNTERCLAIM

Mack next argues that the county court erred in dismissing her counterclaim for removal of Fry as cotrustee. Mack does not allege any breaches of trust by Fry, but simply argues that Fry has made it impossible for Mack to operate the Trust with her.

The majority of the evidence that Mack submits to support Fry's removal either does not deal with Trust property or does not stem from a time when Fry was cotrustee.

While we agree after a de novo review of the record that lack of cooperation among the cotrustees substantially impairs the administration of the trust, we believe that the proper remedy is removal of Mack for the reasons discussed above and we agree with the county court's decision not to remove Fry as trustee.

## 10. ATTORNEY FEES

Mack finally asserts that the county court erred in assessing $258,805.92 against her for Fry's attorney fees. The Trust Code empowers a court in any judicial proceeding involving the administration of a trust to award "reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy." Neb. Rev. Stat. § 30-3893 (Reissue 2008). The parties stipulated at trial that the attorney fee amounts submitted by each party were reasonable. Accordingly, the only error assigned is that attorney fees should not have been allocated to Fry from Mack. Through this action, Fry recovered significant funds for the Trust from Mack. Therefore, we find that the county court's allocation of attorney fees from Mack to Fry was proper. This assignment of error is without merit.

## 11. GUROCK'S CROSS-APPEAL

We turn now to Gurock's cross-appeal. However, before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction. *Murray v. Stine*, 291 Neb. 125, 864 N.W.2d 386 (2015). Standing is fundamental to a court's exercising jurisdiction, so a litigant or court can raise the question of standing at any time during the proceeding. *Middle Niobrara NRD v. Dept. of Nat. Res.*, 281 Neb. 634, 799 N.W.2d 305 (2011). Finding that Gurock lacked standing to file her petition for declaratory judgment, we dismiss her appeal.

Gurock filed for a petition for declaratory judgment, requesting that the county court (1) determine whether Fry's petition violated the Trust's no contest clause, (2) order that the Trustee pay Fry $10,000 and that Fry not share in any other Trust property if her petition did violate the no contest clause, (3) remove Fry as cotrustee if Fry's petition violates the no contest clause,

(4) dismiss Fry's petition for lack of standing if it violates the no contest clause, (5) order that all of Fry's outstanding discovery be quashed for lack of standing if Fry's petition violates the no contest clause, (6) order that the Trust pay Gurock's attorney fees and costs if Fry's petition violates the no contest clause.

Nebraska law requires that every action be prosecuted in the name of the real party in interest. Neb. Rev. Stat. § 25-301 (Reissue 2008). The focus of the real party in interest inquiry is whether the party has standing to sue due to some real interest in the cause of action, or a legal or equitable right, title, or interest in the subject matter of the controversy. *Manon v. Orr*, 289 Neb. 484, 856 N.W.2d 106 (2014). The purpose of the real party in interest inquiry is to determine whether the party has a legally protectable interest or right in the controversy that would benefit by the relief to be granted. *Id.*

The Nebraska Supreme Court has stated:

[Section] 30-3855(a) clearly provides that where the trust is revocable, . . . the settlor is in control of the trust. The plain language of this statute suggests that the only real party in interest in a case involving a revocable trust would be the settlor of that trust, or perhaps one that represents the settlor's interests, for example, a court, a guardian or conservator, or a next friend. But plaintiffs here are contingent beneficiaries of the trust and have no real interest in the cause of action or a legal or equitable right, title, or interest in the subject matter of the controversy. This result is supported by our case law, which provides that a mere expectancy is insufficient to entitle a prospective heir to bring an action to recover property. Nor is this result affected by [the settlor's] alleged incapacity. There is nothing in the plain language of § 30-3855(a), . . . which would suggest that the revocable status of a trust is affected by the settlor's alleged incapacity.

*Manon v. Orr*, 289 Neb. at 487-88.

While we recognize that Gurock resided in the Residence at the time she filed the declaratory judgment action, she did so pursuant to a lease, and not pursuant to any provision of the revocable Trust. As to her interest under the Trust, we find that Gurock is merely a contingent beneficiary. Article VI provides for "Disposition of the Trust Property After Settlor's Death" and states:

After the Settlor's death the Trustee shall hold and dispose of the Trust property as follows:

. . . .

2. Settlor is presently the owner of [the Residence]. I hereby direct that the Trustee shall allow and permit [Gurock] to occupy said premises as principal place of residence for the benefit of her and her family; provided, however that while remaining on premises, without compensation to Trustee, [Gurock], shall be responsible for payment of real estate taxes, insurance premiums, and routine and orderly maintenance expenses during the period of her occupancy.

Under the plain and unambiguous language of the Trust instrument, Gurock obtains a beneficiary interest in residing in the Trust property only "after the Settlor's death." Bresel was alive at the time that Gurock's petition was filed and at the time the county court's order was entered. Accordingly, Gurock was only a contingent beneficiary whose rights were subject to control of

the Settlor. See *Manon v. Orr*, *supra*. Although she was residing in the Residence, she was doing so under the provisions of a written lease. She had no real future interest in the Trust property but only an expectancy, and she therefore did not have standing to file her petition or this appeal.

Even if we had alternatively construed the Trust to grant Gurock an inter vivos beneficial interest in occupying the Trust Residence, her interests were still subject to the control of Bresel at the time of this litigation and she therefore was not the real party in interest. See *Manon v. Orr*, *supra*. Further, Gurock's petition for declaratory judgment seeks relief from the court disinheriting Fry, removing her as trustee, and dismissing Fry's petition. None of these requested forms of relief have any impact on any interest that Gurock may have had in the Trust Residence during Bresel's life. Accordingly, Gurock is not a real party in interest and we do not have jurisdiction to hear her appeal. See *Murray v. Stine*, 291 Neb. 125, 864 N.W.2d 386 (2015).

## VI. CONCLUSION

After our review of the appellate record, we affirm the county court's order removing Mack as trustee and dismissing her counterclaim. We modify the county court's order to eliminate that portion of the order requiring Mack to pay $120,000 to reimburse cash withdrawals from safe deposit boxes owned by Bresel but otherwise affirm the reimbursement of funds to the Trust ordered by the court. We also affirm the county court's award of attorney fees to Fry from Mack. Finally, we dismiss Gurock's cross-appeal for lack of jurisdiction.

AFFIRMED AS MODIFIED.